UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| R. JOE FILLMORE, ) | |
| ) | |
| Plaintiff, ) | 2:10cv00620 JWS |
| ) | |
| vs. ) | ORDER AND OPINION |
| ) | |
| JEFFREY SHARP, ) | [Re: Motion at Docket 32 and 34] |
| ) | |
| Defendant. ) | |

## I.  MOTIONS PRESENTED

At docket 32, defendant Jeffrey Sharp ("defendant" or "Sharp") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiff R. Joe Fillmore ("plaintiff" or "Fillmore") opposes the motion at docket 39.  Defendant's reply is at docket 47.

At docket 34, Fillmore moves to strike portions of Sharp's motion for summary judgment.  Sharp opposes the motion at docket 36.  No reply was filed.  Oral argument would not assist the court.

## II.  BACKGROUND

This lawsuit arises out of a prolonged investigative detention.  At around 2:00 a.m. on March 13, 2010, Sharp–an Arizona police officer–observed Fillmore's

vehicle drifting within its lane on Interstate 17.  Fillmore was traveling with his wife and their dog from their home in Vail, Arizona, to Flagstaff, Arizona, to assist their daughter with a court appearance.  Most of the incident was captured on Sharp's in-vehicle video camera.[1]  Sharp initiated a traffic stop based on Fillmore's driving.  Fillmore took the nearest freeway exit at Sharp's direction and pulled over.  Sharp told Fillmore that he had been weaving and asked Fillmore to get out and stretch his legs when Fillmore indicated he might have been feeling tired.  Outside of the vehicle, Sharp asked Fillmore where he was going, who he was staying with, and the duration and purpose of his trip.  Sharp subsequently returned to the vehicle's passenger-side window and asked Fillmore's wife similar questions.  Sharp maintains that Fillmore's wife offered a slightly inconsistent response as to the duration of their trip.

Sharp returned to Fillmore and issued him a warning citation.  At some point, however, Sharp became suspicious that Fillmore was transporting drugs and asked for consent to search his vehicle.  Fillmore did not offer his consent.  Sharp then returned to his own vehicle and requested a drug-detection dog.  The dog was requested at 2:19 a.m. and the sniff search began approximately thirty minutes later.  Fillmore and his wife complied with officers' requests to exit their vehicle with their pet.  Sharp stood near the Fillmores while the dog's handler cued a search of the exterior of the Fillmores' vehicle.  The passenger-side window was partially open.  The sniff search lasted approximately four minutes.  At 2:57 a.m., Fillmore and his wife were permitted to leave.  They were ultimately detained for approximately one hour.

---

[1] *See* doc. 33-1.

Fillmore filed suit in federal court against Sharp and Robert Halladay ("Halladay"), Director of the Arizona Department of Public Safety. Halladay was terminated as a defendant in an amended complaint. Fillmore asserts claims against Sharp pursuant to 42 U.S.C. § 1983 for a violation of his Fourth Amendment right to be free from unreasonable search or seizure. His complaint alleges that his Fourth Amendment rights were violated by the prolonged detention and the use of a drug-detection dog to search the interior of his vehicle. Fillmore seeks $100,000 in compensatory damages and punitive damages on the premise that Sharp has a habit or practice of violating the Fourth Amendment.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."[2] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[3] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the

---

[2] Fed. R. Civ. P. 56(c)(2).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4] *Id.*

non-moving party.[5] The reviewing court may not weigh evidence or assess the credibility of witnesses.[6] The burden of persuasion is on the moving party.[7]

## IV.  DISCUSSION

### A. Motion to Strike

Fillmore moves pursuant to Rule 12(f) to strike certain background information in Sharp's motion. Rule 12(f) only applies to "redundant, immaterial, impertinent, or scandalous" information in a pleading.[8] A motion is not a pleading.[9] Fillmore therefore has not identified a procedural vehicle for his motion to strike.[10] The court notes, however, that the material Fillmore seeks to strike has no bearing on the disposition of Sharp's motion for summary judgment.

### B. Whether Sharp Had Reasonable Suspicion Justifying the Initial Stop

As a threshold matter, Fillmore's complaint does not directly challenge the lawfulness of the initial stop. The complaint states only that Fillmore was "pulled over without probable cause."[11] Because both parties devote considerable space to the issue in their briefing and because Fillmore is proceeding *pro se*, the court will address

---

[5]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[6]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[7]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[8]Fed. R. Civ. P. 12(f).

[9]*See* Fed. R. Civ. P. 7(a).

[10]*See* LRCiv 7.2(m)(1).

[11]Doc. 1 ¶ 6.

the issue on the chance that Fillmore intended to assert a claim based on the lawfulness of the initial stop.

Sharp argues that Fillmore's investigatory detention was supported by reasonable suspicion and therefore that there was no Fourth Amendment violation pertaining to the initial stop. Fillmore maintains that Sharp did not have a reasonable suspicion that Fillmore was driving while impaired because he did not drift within his lane until after Sharp accelerated and "chose[] to bear down upon him."[12]

"Reasonable suspicion is formed by specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity."[13] In determining whether an officer had reasonable suspicion of criminal activity, reviewing courts "must look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."[14]

Sharp cites *State v. Blake*, in which the Arizona Supreme Court found that a defendant's "weaving was a specific and articulable fact which justified an investigative stop"[15] for impaired driving. Fillmore argues that *Blake* is not controlling because his claim is federal. Fillmore is generally correct that federal law governs disposition of his Fourth Amendment claim. However, whether certain conduct gives rise to reasonable suspicion that a *state crime* has been committed is dependent on interpretation of state

---

[12] Doc. 39 at 2.

[13] *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) (internal quotations omitted).

[14] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[15] 718 P.2d 171, 175 (Ariz. 1986).

law. Consequently, state court decisions that speak directly to the issue are controlling.[16]

Here, the drifting that allegedly gave rise to Sharp's suspicion was captured on video by a camera affixed to Sharp's police car. Where video evidence contradicts a party's version of the events, on a motion for summary judgment a court must accept the facts as depicted in the video provided "[t]here are no allegations or indications that [the] video[] was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened."[17] There are no such allegations or indications here. The video shows moderate drifting, and ultimately there is no dispute that Fillmore's vehicle was "meandering within its lane."[18]

Given the totality of the circumstances–including the time of the stop and Sharp's training–the court concludes that Sharp had a reasonable suspicion that Fillmore was driving while impaired. The initial stop of Fillmore's vehicle did not violate the Fourth Amendment.

**1. Sharp's Presence Does Not Affect the Analysis**

Fillmore argues that Sharp's presence caused him to drift within his lane and therefore no inference can fairly be drawn from his own driving.[19] Fillmore cites a case from the Eight Circuit, in which the court adopted the Fifth Circuit's conclusion that

---

[16]*See, e.g.*, *Colin*, 314 F.3d at 445–46 (applying *People v. Perez*, 221 Cal. Rptr. 776, 778 (Cal. Ct. App. 1985)).

[17]*Scott v. Harris*, 550 U.S. 372, 379, 380–81 (2007).

[18]*Blake*, 718 P.2d at 173 (Ariz. 1986).

[19]Doc. 39 at 3.

"when [an] officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed."[20]  It is not clear from the video whether Fillmore's drifting was caused by his preoccupation with Sharp's presence, but the dispute is not material because Fillmore does not cite any Ninth Circuit authority in support of that proposition and the court declines to adopt the rule on these facts.

### 2. Sharp's Failure to Conduct Field Sobriety Tests

Fillmore maintains that Sharp could not have had a reasonable suspicion that he was driving while impaired because he did not ask Fillmore if he had been drinking or ask to perform roadside sobriety tests.  As defendant correctly points out, impaired driving is not limited to driving while under the influence of alcohol.  There are a number of bases on which Sharp could have immediately concluded that Fillmore had not been drinking alcohol.  That does not affect whether Fillmore's driving gave rise to reasonable suspicion that he was impaired.  Moreover, as defendant also points out, subjective intent in making a stop is irrelevant so long as the stop is supported by a reasonable suspicion of criminal activity.[21]

---

[20] *United States v. Jones*, 269 F.3d 919 (8th Cir. 2001) (quoting *United States v. Jones*, 149 F.3d 364, 370 (5th Cir. 1998)).

[21] *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind . . . is irrelevant to the existence of probable cause.").

**C. Whether the Extended Investigation Was Justified**

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."[22] The Supreme Court has "rejected the notion that [a] shift in purpose from a lawful traffic stop into a drug investigation [is] unlawful [if it is] not supported by any reasonable suspicion."[23] However, a seizure that is *prolonged* beyond its original purpose must be "supported by separate reasonable suspicion."[24] Here, there is no dispute that Fillmore's detention was prolonged when Sharp called for a drug-detection dog.

Sharp argues that the continued detention was reasonable. First, Sharp argues that Fillmore consented. Second, Sharp argues that even if Fillmore did not consent, the continued investigation was supported by a separate reasonable suspicion that Fillmore was transporting drugs.

Fillmore responds first that Sharp's questions–unrelated to the justification for the stop–had to be supported by reasonable suspicion. Fillmore relies on *United States v. Chavez-Valenzuela*.[25] However, the Ninth Circuit has "acknowledged that the Supreme Court ha[s] overruled those portions of *Chavez-Valnezuela* . . . that required police officers to have reasonable suspicion to *ask questions* beyond the scope of a traffic

---

[22]*Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[23]*Muehler v. Mena*, 544 U.S. 93, 101 (2005) (citing *Caballes*, 543 U.S. at 408) (internal quotations omitted)

[24]*United States v. Mendez*, 476 F.3d 1077, 1081 (9th Cir. 2007).

[25]268 F.3d 719 (9th Cir. 2001).

stop."[26]  Therefore, the issues are whether Fillmore consented to the prolonged traffic stop or whether Sharp held a reasonable suspicion justifying the expanded scope of the stop.

### 1.  Fillmore Did Not Consent to a Prolonged Investigation

Sharp argues that Fillmore consented to remaining at the scene of the detention. A seizure under these circumstances depends on whether, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."[27]  Sharp gave Fillmore no indication that he was free to leave after receiving the warning citation and before the drug-detection dog arrived.  It is clear from the video evidence that a reasonable person would not have felt free to go about his or her business.  Fillmore did not consent to the prolonged encounter.

### 2.  Whether the Prolonged Encounter Was Supported by Reasonable Suspicion

Sharp maintains that he had a reasonable suspicion that Fillmore was transporting drugs based on 1) the time at which Fillmore and his wife were traveling; 2) the presence of covered items on the passenger side floorboard; 3) a lack of eye contact with Fillmore's wife; 4) a small suitcase on the backseat; 5) the presence of the Fillmores' dog; 6) Fillmore's stretching; 7) Fillmore's "constant talking" and "small talk";

---

[26] *United States v. Turvin*, 517 F.3d 1097, 1099–1100 (9th Cir. 2008) (citing *Mendez*, 476 F.3d at 1080) (emphasis added).

[27] *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotations omitted).

8) inconsistent statements as to the duration of the trip between Fillmore and his wife; 9) the "dramatic change" in Fillmore's demeanor; and 10) Fillmore's familiarity with Fourth Amendment case law.[28]  Even in the aggregate, those facts are not persuasive.

Sharp maintains that based on his drug interdiction training, those facts gave him a reasonable suspicion that Fillmore was transporting drugs. While the "process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person,"[29] Sharp's training does not appear relevant to any of the articulated facts.  The time of travel is not inherently suspicious.  Most overnight travelers would have a suitcase, and the backseat is not an uncommon place to put one.  The fact that the Fillmores' dog was also in the backseat does not make the otherwise commonplace circumstances suspicious, especially given that there was no other place for the dog to ride.  A lack of eye contact is not indicative of drug running. Covered items on the floor *might* suggest to an officer that a driver was transporting drugs, but it stands to reason that a drug runner would put their drugs in the trunk and not on the passenger compartment floor.  Similarly, conflicting responses from passengers regarding travel plans *could* be suspicious in the context of other facts, but there was no such context here.

In short, none of the proffered facts are indicative of drug transportation, and the sum of those facts does not assume a criminal nature when the facts are assessed in

---

[28]Doc. 32 at 13.

[29]*Arvizu*, 534 U.S. at 273 (internal quotations omitted).

their totality. Consequently, Sharp has not articulated facts sufficient to support a reasonable suspicion that Fillmore was transporting drugs.

**D. Use of a Drug-Detection Dog Did Not Implicate the Fourth Amendment**

"[T]he use of a well-trained narcotics-detection dog–one that does not expose noncontraband items that otherwise would remain hidden from public view–during a lawful traffic stop, generally does not implicate legitimate privacy interests."[30] Sharp maintains that the dog sniff search did not implicate the Fourth Amendment. Fillmore argues that the Fourth Amendment was implicated and violated when the dog sniffed at (or inside) the car's open window. Here, the dog sniff was performed primarily on the exterior of the vehicle, but the passenger-side window was open, and the dog's handler cued the dog to search near the open window. Whether the dog actually put its head inside the open window is immaterial because the video evidence shows that it was not prompted to sniff *inside*.[31] Moreover, the police officers did not direct the Fillmores to open the window prior to the dog's arrival and did not direct them to leave the window open when they exited the vehicle.[32] The legality of the sniff search cannot turn on whether a window is open or closed.

---

[30]*Caballes*, 543 U.S. at 409.

[31]Doc. 33-1.

[32]*See United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) (sniff search upheld where there was no evidence that police asked the defendant to open his vehicle's hatchback or that the dog's handler encouraged the dog to jump in the car). When Fillmore's wife asked to close her window at an earlier time, Sharp requested that she only close it halfway. That exchange occurred before the drug-detection dog arrived and was unrelated to the sniff search.

**E. Punitive Damages**

Sharp argues that there is no basis for punitive damages. Fillmore does not refute that argument. Fillmore has not offered any evidence that Sharp's conduct was "malicious, wanton, or oppressive."[33] Nor has Fillmore supported his allegation that Sharp has a "habit and practice" of violating constitutional rights.[34] Sharp is not subject to punitive damages.

### V. CONCLUSION

For the reasons above, plaintiff's motion to strike at docket 34 is **DENIED**. Defendant's motion at docket 32 for summary judgment pursuant to Rule 56 is **GRANTED** in part and **DENIED** in part as follows:

1) It is granted to the extent that the initial stop was supported by reasonable suspicion, the use of the drug-detection dog did not violate Fillmore's Fourth Amendment rights, and Sharp is not subject to punitive damages.

2) It is denied insofar as Sharp has not articulated sufficient facts giving rise to a reasonable suspicion of drug-related activity justifying the prolonged detention.

DATED this 1st day of November 2011.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[33] *See Dang v. Cross*, 422 F.3d 800, 807, 808 (9th Cir. 2005).

[34] Doc. 1 ¶ 25.